Bob MERRILL; Jule Styne; Rilting Music, Inc.; Revelation Music Publishing Corp.; Stonebridge Music; Lupercalia Music Publishing Co.; Impulsive Music; April Music, Inc.; Cherry Lane Music Publishing Co., Inc.

v.

The COUNTY STORES, INC.; James Infanti.

Civ. No. 87–8–D.

United States District Court, D. New Hampshire.

Sept. 17, 1987.

---

Ransmeier & Spellman by John C. Ransmeier, Concord, N.H., for plaintiffs.

Runyon and Sweeney, P.A. by Walter H. Sweeney, Peterborough, N.H., for defendants.

## ORDER

DEVINE, Chief Judge.

Plaintiffs bring this copyright infringement action pursuant to the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* [hereinafter "Copyrights Act" or "Act"], asserting jurisdiction under 28 U.S.C. § 1338(a), in connection with their contention that their copyrighted songs are being broadcast in defendants' store without licensing fees having been paid. At bar are defendants' motion for summary judgment, Rule 56(b), Fed.R.Civ.P., plaintiffs' cross-motion for summary judgment, Rule 56(a), Fed.R. Civ.P., and defendants' objection thereto. Pleadings, deposition transcripts, answers to interrogatories, admissions, and affidavits having been filed with the Court, and the issues raised by this litigation being clear, the Court resolves the motions at bar on the documents as filed. *See* Rule 11(g), Rules of the United States District Court for the District of New Hampshire.

### Factual Background

The focus of this litigation is The County Stores hardware store in Milford, New Hampshire ("Milford store"), a 20,000–square-foot facility owned and operated by corporate defendant The County Stores, Inc. ("TCS"). The Milford store has thirty-two employees and 1986 annual retail sales of approximately $2.5 million,[1] generated from approximately 13,000 square feet of floor space open to the public. Memorandum in Support of Defendants' Motion for Summary Judgment [hereinafter "Defendants' Memorandum"] ¶¶ 28, 36, at 8, 10. James Infanti, also a named defendant herein, is Treasurer of TCS, owner of two-thirds of the nonvoting stock of TCS, manager of the Milford store and three other TCS retail establishments, *id.* ¶ 25, at 8, and "primarily responsible for the management of the [Milford] store," Answer ¶ 5, at 5. Plaintiffs are music composers and publishers who license their copyrighted works through the American Society of Composers, Authors, and Publishers ("ASCAP") to individuals and businesses desiring to publicly perform or broadcast said works.

The Milford store has an employee intercommunication system which includes a radio receiver set up in such a manner that the store is able to broadcast radio station programs, including music, throughout the store. The store has done so, twenty-four hours per day, for more than seventeen years. Defendants' Memorandum ¶ 30, at 8–9. Broadcasts are occasionally momentarily interrupted via an automatic override so that employees can be paged to help customers. Additionally, the incoming radio signal is transmitted to customer telephone calls which have been placed on hold. Deposition of James Infanti at 40–41.

Until 1985, the intercommunication system incorporated ten or eleven speakers, four to six of which were in public areas of the store; however, in 1984 or 1985, the system was upgraded to include a slightly better radio receiver and six to eight additional speakers. All speakers are eight inches in size and recessed into the store's ceiling. Defendants' Memorandum ¶ 33, at 10.

---

**1.** As of May 1987, annual sales in the Milford store were twenty percent ahead of the 1986 figures. Deposition of James Infanti at 71.

Defendants have not received permission from any radio station to rebroadcast radio programs. Defendants have also failed to obtain any sort of ASCAP licensing agreement, despite having received bills and correspondence from ASCAP regarding copyright licensing since 1981. *Id.* ¶¶ 10, 17, 19–21, 39, at 4–11; Memorandum in Support of Plaintiffs' Cross-Motion for Summary Judgment [hereinafter "Plaintiffs' Memorandum"] at 5–6; Answer ¶ 11.

On the afternoon of September 6, 1986, ASCAP undercover investigators Robert and Paula Pickett surreptitiously (but entirely legally, *see Milene Music v. Gotauco*, 551 F.Supp. 1288, 1291 (D.R.I.1982)), visited the Milford store. While posing as customers, the Picketts ascertained the locations of the store's ceiling speakers, identified the call letters of the radio station being played, and made note of the titles of twenty-six songs broadcast between 3:04 and 4:55 p.m. *See* duplicate Affidavits of Paula Pickett and Robert M. Pickett at 2 & attached Exhibits A at 1–2. Each Pickett affidavit states: "I recall that the music was clearly audible throughout the store, so that I could easily hear and identify the performers of the songs which were sung." *Id.* at 2.

Among the songs the Picketts listed were six which form the basis of the instant litigation: "People", "Send in the Clowns", "Love on the Rocks", "We'll Sing in the Sunshine", "She's Always a Woman", and "Leaving on a Jet Plane", each of which is copyrighted by a plaintiff herein.[2] Plaintiffs contend that each unauthorized transmission of these songs constitutes a separate cause of action, six causes of action in total.

### Rulings of Law
### The Summary Judgment Standard

The standards governing consideration of motions for summary judgment are an old familiar song. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The burden is upon the moving party to establish the lack of a genuine, material factual issue, *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir.1986), and the Court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence, *Ismert & Assoc. v. New England Mut. Life Ins. Co.*, 801 F.2d 536, 537 (1st Cir.1986). When, as in the case at bar, both motions demonstrate basic agreement with regard to relevant legal theories and the underlying material facts of the dispute, cross-motions may be probative of a lack of a genuine factual dispute. *United Nuclear Corp. v. Cannon*, 553 F.Supp. 1220, 1226 (D.R.I.1982) (citing *Bricklayers Int'l Union of America v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir.1975)). And, if both parties' motions are based on the *same* legal theory, "a court's granting of one party's motion must perforce entail the denial of the adversary's motions." *Id.*

With these standards in mind, the Court considers the facts of this case against the backdrop of copyright infringement law.

### Prima Facie Infringement of a Copyrighted Musical Work

The United States Constitution provides that Congress is empowered "[t]o promote the Progress of Science and useful Arts, by securing for limited Time to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8. Pursuant thereto, the Copyrights Act grants to the owner of a copyrighted musical work the exclusive right to publicly perform or authorize another to publicly perform the owner's copyrighted work. 17 U.S.C. § 106(4). Violation of the exclusive rights granted by the Act constitutes copyright infringement, *id.* § 501(a), remediable by injunctive relief, *id.* § 502(a), damages—actual or statutory, *id.* § 504, and reimbursement of the full costs

---

**2.** On July 2, 1987, the parties filed a written stipulation with the Court as to the respective plaintiffs' ownership of valid copyrights in these six songs.

of bringing suit, including reasonable attorneys' fees, *id.* § 505. Based on this framework, a copyright owner may assign the licensing of public performances to others, such as ASCAP, on terms amenable to the copyright owner. *See, e.g., Milene Music, supra,* 551 F.Supp. at 1292 (and citations therein). Such occurred here.

A copyright owner alleging copyright infringement must establish five elements to establish a prima facie case: (i) the originality and authorship of the works involved, (ii) compliance with the formalities of federal copyright law, (iii) rightful proprietorship of the copyrights at issue, (iv) that the copyrighted works were performed publicly for profit, and (v) a lack of authorization by the owner or the owner's representative for the alleged infringer to publicly perform the works. *See, e.g., Sailor Music v. Mai Kai of Concord, Inc.,* 640 F.Supp. 629, 632 (D.N.H.1986) (and citations therein). In the instant case, plaintiffs have supported each element of their prima facie case by reference to pleadings, deposition transcripts, answers to interrogatories, or affidavits. *See* Plaintiffs' Memorandum at 4–6, 9–10. Plaintiffs' assertions as to their prima facie case have gone uncontradicted, both in Defendants' Memorandum and in Defendants' Response to Plaintiffs' Cross-Motion for Summary Judgment ("Defendant's Response"). As defendants have failed to refute plaintiffs' properly-supported motion, the Court must grant summary judgment to plaintiffs as to having established a prima facie case of copyright infringement. *See Donovan v. Agnew,* 712 F.2d 1509, 1516 (1st Cir.1983); *Over the Road Drivers, Inc. v. Transport Ins. Co.,* 637 F.2d 816, 818 (1st Cir.1980); *Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 633.

*The Section 110(5) Small Business Establishment Exemption*

Defendants' liability, however, does not automatically flow from plaintiffs' establishment of a prima facie case of copyright infringement. Copyright owners alleging infringement must also contend with section 110(5) of the Act, codified at 17 U.S.C. § 110(5), which exempts certain small business establishments from having to contract with organizations such as ASCAP before publicly playing or rebroadcasting copyrighted musical works. This section exempts from infringement liability:

> communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes, unless—
>
> (A) a direct charge is made to see or to hear the transmission; or
>
> (B) the transmission thus received is further transmitted to the public.

117 U.S.C. § 110(5).

Section 110(5) was enacted in reaction to *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). In *Aiken,* a copyright infringement action was brought against a small fast-service food shop with a total floor space of approximately 1055 square feet, of which 620 square feet were open to the public. The shop regularly played radio programs in its customer area by means of a radio receiver and four ceiling speakers. Alleging infringement, two copyright owners who had granted licensing rights to AS-CAP and whose songs had been rebroadcast in the restaurant brought suit. Holding that the restaurant was exempt from having to pay copyright licensing fees, the Court noted that unless small businesses were exempt from the copyright laws, the result would be "a regime of copyright law that would be both wholly unenforceable and highly inequitable." *Id.* at 162, 95 S.Ct. at 2047.

Congress specifically considered *Aiken* when drafting section 110(5). In its report, the House Judiciary Committee stated:

> Under the particular fact situation in the *Aiken* case, assuming a small commercial establishment and the use of a home receiver with four ordinary loudspeakers grouped within a relatively narrow circumference from the set, it is intended that the performances would be exempt under clause (5). However, the Committee considers this fact situation to represent the outer limit of the exemp-

tion, and believes the line should be drawn at that point. Thus, the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial 'sound system' installed or converts a standard home receiving apparatus (by augmenting it with sophisticated or extensive amplification equipment) into the equivalent of a commercial sound system. Factors to consider in particular cases would include the size, physical arrangement, and noise level of the areas within the establishment where the transmissions are made audible or visible, and the extent to which the receiving apparatus is altered or augmented for the purpose of improving the aural or visual quality of the performance for individual members of the public using those areas.

H.R.Rep. No. 1476 [hereinafter "House Report"], 94th Cong., 2d Sess. 87, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5701; *see also* H.R.Conf.Rep. No. 1733, *id.* at 5810, 5816 (exemption applicable only to establishments which are not "of sufficient size to justify, as a practical matter, a subscription to a commercial background music service").

Defendants contend that the Milford store fits within the section 110(5) exemption. First, defendants argue that section 110(5)'s "unconstitutionally vague" lack of specificity, combined with what defendants assert to be ambiguous language in the legislative history, "can only lead to arbitrary interpretations." Defendants' Memorandum ¶¶ 49–51, at 18–19. Second, defendants argue that the Milford store is a small family-run operation much like the food shop at issue in *Aiken. Id.* ¶¶ 46, 48, at 16–17. Third, defendants argue that a copyright owner need be compensated only if use of the copyrighted work is intended to enhance or increase sales. *Id.* ¶ 52, at 20; *see also id.* ¶ 30, at 8–9 (music is for the benefit of employees, not customers). Fourth, defendants argue that their sound system has marginal audibility. Finally,

defendants argue that they have never looked into the cost of a commercial background music service. The Court addresses these arguments in scandent order.

■ Even accepting as true defendants' assertion that they never researched the cost of a commercial background music service, the point is irrelevant. Evidence is relevant if it has "probative value in relation to the purpose for which it is offered." Black's Law Dictionary 1160 (5th ed. 1979); *see also* Rule 401, Fed.R.Evid. advisory committee's notes. The issue at hand is whether the Milford store fits within the section 110(5) small business establishment exemption. Whether and to what degree defendants were aware of what ASCAP or other music services charged has no probative value toward showing that the Milford store is a small commercial establishment within the meaning of *Aiken* or that the Milford store is of sufficient size to justify subscribing to a commercial background music service. Irrelevant evidence is inadmissible. Rule 402, Fed.R.Evid.

■ Defendants' argument that they are entitled to relief based on the inaudible quality of the Milford store's broadcasts is without merit. The argument strains credulity, for no worthwhile business purpose could be served by projecting inaudible and possibly annoying radio broadcasts into customer areas. The argument is disingenuous in that it contradicts defendants' assertion that the music is for the benefit of employees rather than customers. Finally, even granting that the Court should consider the noise level of the Milford store's selling areas and by implication the audibility of the broadcasts in those areas, *see* House Report at 5701 (language quoted above), defendants have come forth with no evidence to refute the affidavits supplied by Mr. and Mrs. Pickett attesting to the audibility of the broadcasts. If a moving party has properly supported a motion for summary judgment, the burden of proof shifts to the nonmovant to demonstrate the existence of a genuine issue for trial. *Over the Road Drivers, Inc., supra,* 637 F.2d at 818–19; *Donovan v. Agnew, supra,*

712 F.2d at 1516. Defendants have failed to refute the evidence plaintiffs have produced; accordingly, defendants' argument fails.

■ Defendants' third argument is that they should not have to pay ASCAP licensing fees because their playing of radio programs was not intended to enhance or increase store sales. However, the legislative history of the Act makes it clear that the transmission of a performance in the workplace for the benefit of employees is a "public performance" subject to copyright control. House Report 64 at 5677–78. Additionally, defendants' purpose in providing employee benefits is not charitable. Such benefits are meant to increase employee productivity and thereby indirectly increase and enhance sales. Third, defendants' insistence on publicly playing radio programs despite six years of ASCAP opposition and the looming spectre of litigation gives probative force to a finding that the radio music was valued, presumably for its contribution to the Milford's store's ambience as a pleasant place in which to shop. Finally, defendants' argument is belied by the fact that the radio signal is also transmitted to incoming customer telephone calls which have been placed on hold. Obviously, such transmission provides no benefits to employees. In short, "if music did not pay it would be given up. If it pays it pays out of the public's pocket. Whether it pays or not the purpose of employing it is profit and that is enough." *Herbert v. Shanley Co.*, 242 U.S. 591, 595, 37 S.Ct. 232, 233, 61 L.Ed. 511 (1917); *see also Aiken, supra,* 422 U.S. at 164–65, 95 S.Ct. at 2047–48 (Blackmun, J., concurring); *id.* at 169–70, 95 S.Ct. at 2050–51 (Burger, C.J., dissenting) (and citations therein).

■ Defendants' next argument is that the Milford store is similar to the food shop at issue in *Aiken* and thus within the "outer limit" Congress had in mind when it enacted section 110(5). The Court disagrees. The intercommunication system at the Milford store consists of fourteen or fifteen recessed ceiling speakers covering 13,000 square feet of floor area open to the public. Sound may be momentarily interrupted from a number of stations for the purpose of paging employees, and the system is integrated into the store's telephone network so that the incoming radio signal is also transmitted to incoming calls on "hold". By any stretch of the imagination, such a system is not "a single receiving apparatus of a kind commonly used in private homes" as required by the statutory language of section 110(5). *See Broadcast Music, Inc. v. United States Shoe Corp.,* 678 F.2d at 816, 817–18 (9th Cir.1982) [hereinafter *"BMI v. U.S. Shoe"*]; *Rodgers v. Eighty Four Lumber Co.,* 617 F.Supp. 1021, 1023 (W.D.Pa.1985); *Sailor Music v. Gap Stores,* 516 F.Supp. 923, 925 (S.D.N.Y.), *aff'd,* 668 F.2d 84 (2d Cir.1981), *cert. denied,* 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982).

■ Moreover, defendants' $2.5 million in annual retail sales justifies subscription to a commercial background music system. *See BMI v. U.S. Shoe, supra,* 678 F.2d at 817–18; *Sailor Music v. GAP Stores, supra,* 668 F.2d at 86 (420 stores with total revenues of $300 million—$700,000 in average annual sales per store); *cf. Springsteen v. Plaza Roller Dome, Inc., supra,* 602 F.Supp. at 1114, 1118–19 (subscription to background music service not feasible with slightly over $4,000 in annual revenues). Finally, the size of defendants' Milford store precludes section 110(5) applicability. With 13,000 square feet of floor space open to the public, the Milford store is nearly twenty-one times larger than the fast-food shop at issue in *Aiken,* well beyond the "outer limit" of the section 110(5) exemption. *See Sailor Music, supra,* 668 F.2d at 86, 516 F.Supp. at 925; *Rodgers v. Eighty Four Lumber Co., supra,* 617 F.Supp. at 1023.

Defendants' final argument is that section 110(5) is unconstitutional by reason of its lack of specificity and the failure of pertinent legislative history to clarify purported ambiguities. To this there are opposing views. *Compare Springsteen v. Plaza Roller Dome, Inc., supra,* 602 F.Supp. at 1115 ("The meaning of [§ 110(5)'s] statutory language is far from clear, and its reach has scarcely been test-

ed in the courts.") *with BMI v. U.S. Shoe, supra,* 678 F.2d at 817 ("We believe that a person of ordinary intelligence can understand and apply the requirements of the Act."). However, opposing views of the statute's ambiguity notwithstanding, because the Court has found that section 110(5) is clearly inapplicable to the Milford store, the Court eschews unnecessarily considering this constitutional issue. *See Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945) (federal court should not "decide any constitutional question in advance of the necessity for its decision ... or formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.").

In sum, the Court concludes that the Milford store is not the sort of small commercial establishment whose reception and performance of radio transmissions by means of sound equipment commonly found in the home Congress intended to exempt from the Copyrights Act by enactment of section 110(5). Defendants are jointly and severally liable for copyright infringement. *See Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 633; *Milene Music, supra,* 551 F.Supp. at 1294–95 (and citations therein).

Liability having been established, consideration of appropriate remedies follows. Plaintiffs seek injunctive relief, money damages, and the costs of bringing this action, including reasonable attorneys' fees.

*Entitlement to Copyright Infringement Relief*

■ Courts may grant temporary and permanent injunctions to prevent or restrain copyright infringements if a "substantial likelihood of further infringement of plaintiffs' copyrights" exists. *Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 634 (quoting *Milene Music, supra,* 551 F.Supp. at 1295); 17 U.S.C. § 502(a). Considering that every ASCAP attempt to license defendants over the course of more than six years has been rebuffed and that defendants currently remain unlicensed, the Court finds that in-

junctive protection should issue. *See, e.g., Ackee Music, Inc. v. Williams,* 650 F.Supp. 653, 656 (D.Kan.1986); *Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 634, 635; *Milene Music, supra,* 551 F.Supp. at 1295–96. Accordingly, defendants and all persons acting under their direction or control are herewith permanently enjoined from publicly performing or causing to be publicly performed, in violation of the Copyrights Act, directly or indirectly, the copyrighted musical compositions which are the subject of this action, at the Milford store or any other establishment owned or controlled by defendants. *See, e.g., Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 635; *Milene Music, supra,* 551 F.Supp. at 1295–96.

■ Plaintiffs seek statutory damages in lieu of actual damages as authorized by 17 U.S.C. § 504(a). This provision of the Act is designed to deter and discourage wrongful conduct. *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233, 73 S.Ct. 222, 225, 97 L.Ed. 276, *clarification denied,* 350 U.S. 810, 76 S.Ct. 37, 100 L.Ed. 727 (1952). Although the precise amount of the award is left to the district court's sound discretion, *see, e.g., Morley Music Co. v. Dick Stacey's Plaza Motel,* 725 F.2d 1, 2–3 (1st Cir.1983), factors to be considered are the amount of plaintiffs' lost revenues, the expenses saved and profits reaped by defendants in connection with the infringement, the size of defendants' operation, and whether the infringement was intentional or accidental, measured in part by the extent to which defendants resisted ASCAP licensing, *id.* at 3; *Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 635; *Milene Music, supra,* 551 F.Supp. at 1296. The Court may award a prevailing plaintiff from $250 to $10,000 per infringement, 17 U.S.C. § 504(c); if a copyright owner has established infringement and has not chosen to offer proof of actual damages, the district court must award at least the statutory minimum damages of $250 for each infringement, *Jewell-LaSalle Realty Co. v. Buck,* 283 U.S. 202, 51 S.Ct. 407, 75 L.Ed. 978 (1931). Moreover, courts have held

that a copyright infringer "cannot expect to pay the same price in damages as it might have paid after freely negotiated bargaining, or there would be no reason scrupulously to obey the copyright law." *Ackee Music, Inc., supra,* 650 F.Supp. at 657 (quoting *Iowa St. U. Res. Found. v. ABC, Inc.,* 475 F.Supp. 78, 83 (S.D.N.Y. 1979)).

Defendants avoided paying ASCAP fees for more than six years. Defendant James Infanti's disavowal of all knowledge of copyright laws, Infanti Deposition at 80, 83–84, taken in the light of the numerous contacts by ASCAP and the substantial size and nature[3] of TCS's total operation, is disingenuous at best. *See Morley Music Co., supra,* 725 F.2d at 3. Defendant James Infanti was well aware that TCS did not have permission from ASCAP to play plaintiffs' songs. Infanti Deposition at 70, 83–84. Furthermore, although defendants dispute plaintiffs' allegation that, had TCS been properly licensed, ASCAP fees from May 1981 to July 1987 would have amounted to $1,800 (*see* Plaintiffs' Memorandum at 6 (citing John Bonaccorso Deposition, Exhibit U)), defendants merely assert that plaintiffs' figures are incorrect, providing no documentation in contradiction thereof. *See* Defendants' Response at 1–2. Based on all of the above factors, the Court concludes that a statutory fine of $750 for each of the infringing acts is just and proper. *See, e.g., Ackee Music, Inc., supra,* 650 F.Supp. at 657 ($750 per infringement based on a two-year willful refusal to obtain licensing); *Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 636 (and citations therein collecting cases).

Finally, plaintiffs seek costs and reasonable attorney's fees pursuant to 17 U.S.C. § 505. Counsel for plaintiffs has submitted an affidavit setting forth $534.15 in costs, which includes filing and service fees of $220 and stenographic services in the amount of $314.15. Counsel's affidavit also sets forth attorney's fees in the amount of $4,797.20, based on 39.20 hours of labor. Defendants do not object to the reasonableness of these amounts; rather, defendants focus their dispute on (1) ASCAP's entitlement to receive copyright fees at all from TCS, and (2) the correctness of the licensing fee bills ASCAP sent to TCS. Defendants' Response at 1–2. Neither of these objections is relevant to the issue at hand—whether plaintiffs' attorney's fees as charged are reasonable.

■ It is accepted practice for courts to award costs to prevailing copyright owners in copyright infringement actions. *See, e.g., Ackee Music, Inc., supra,* 650 F.Supp. at 657; *Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 636; *Milene Music, supra,* 551 F.Supp. at 1297 (and citations therein). In light of the fact that plaintiffs would not have had to bring this action but for defendants' deliberate refusal to obtain proper licensing, the Court finds that an award of costs is justified. Costs of $534.15 are therefore awarded to plaintiffs.

■ It is within the Court's sound discretion to determine whether and in what amount attorney's fees should be granted to a prevailing copyright owner under 17 U.S.C. § 505. *Sailor Music v. Mai Kai of Concord, Inc., supra,* 640 F.Supp. at 636 (citing *Milene Music, supra,* 551 F.Supp. at 1297). In determining what constitutes a reasonable award, courts consider, inter alia, "counsel's time and labor, the complexity of the case, the amount recovered, and the reasonableness of the time spent by counsel." *Id.* (citing *Milene Music, supra,* 551 F.Supp. at 1298). After weighing these factors, the Court is satisfied that, aside from several small exceptions which are noted below, the hours delineated in the well-supported motion of plaintiffs' counsel were fairly required to be spent on the case. The Court disallows the below entries by reason of their lack of specificity:

---

**3.** Among other business enterprises, TCS owns a 5200-square-foot hardware store in Amherst, New Hampshire, with approximately $500,000 in annual sales, Defendant's Memorandum ¶¶ 35–36, at 10, and a 2300-square-foot retail store called CINEMASCOPE, which rents videotapes and sells video equipment, Infanti Deposition at 57–58. Videotapes are, of course, subject to the Copyrights Act.

(1) the entry for .9 hour on January 16, 1987, wherein an unknown person of unknown legal qualifications identified merely as "RTM" performed unspecified "Research at Secretary of State office and memo to John Ransmeier [plaintiffs' counsel] relating to findings"; and

(2) four entries, each for .1 hour, on March 6, April 9, April 16, and June 11, 1987, wherein JMC, a person unknown to the Court, performed "Docket control", a term which is too amorphous to contribute to determining what constitutes reasonable attorney's fees.

The total of the above-disallowed entries is 1.3 hours, reducing counsel's stated hours to a total of 37.9. On a pro rata basis, the total amount of fees is thus reduced from the $4,797.20 requested by counsel to $4,638.11. As the Court is satisfied that the skill required of and employed by plaintiffs' counsel was of the highest caliber, the Court approves counsel fees to plaintiff in the above-stated reduced amount, $4,638.11.

### Conclusion

Inasmuch as undisputed facts establish that TCS and James Infanti violated the Copyrights Act by infringing plaintiffs' valid copyrights, the Court concludes that plaintiffs are entitled to summary judgment as a matter of law. Accordingly, defendants' motion for summary judgment (document no. 6) is denied, and plaintiffs' cross-motion for summary judgment (document no. 8) is granted.

As set forth in greater detail above, plaintiffs are entitled to injunctive relief precluding further infringement, statutory damages of $4,500, costs of $534.15, and attorney's fees in the amount of $4,638.11. The aggregate of plaintiffs' recovery, therefore, a sum for which defendants are jointly and severally liable, is $9,672.26.

SO ORDERED.