Broadcast Music v. Hampton Beach      CV-94-248-B      09/05/95
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE

Broadcast Music Inc., et al

v.                                      Civil No. 94-248-B

Hampton Beach Casino Ballroom Inc.
d/b/a Hampton Beach Casino and Frank Shaake


                           **O R D E R**

     Plaintiffs, Broadcast Music, Inc. ("BMI") and several

copyright owners, filed suit against defendants, Hampton Beach

Casino Ballroom, Inc. ("HBCB") and Fred Shaake, for copyright

infringement pursuant to 17 U.S.C.A. § 101 et seq. (West 1977 &

Supp. 1995), seeking injunctive relief, statutory damages, and

costs including reasonable attorney's fees.  The plaintiffs have

moved for summary judgment.  In response, defendants raise the

defense of copyright misuse.  For the following reasons, I grant

plaintiffs' summary judgment motion.

                       **I. Background**[1]

A. BMI and HBCB

     BMI licenses the right to publicly perform copyrighted

_____

     [1]The factual background is stated in the light most
favorable to the nonmovant, according all beneficial inferences
discernable from the evidence.  Oliver v. Digital Equip. Corp.,
846 F.2d 103, 105 (1st Cir. 1988).

musical compositions.  It acquires these nonexclusive rights through agreements with the copyright owners.  The agreements are "blanket license agreements," which allow music halls, clubs or restaurants to play the music in BMI's repertoire for a specific period.  Broadcast Music, Inc. v. Columbia Broadcasting Sys. Inc., 441 U.S. 1, 5 (1979).  "Fees for blanket licenses are ordinarily a percentage of total revenues or a flat dollar amount, and do not directly depend on the amount or type of music used."  Id.; accord Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Svc., 746 F. Supp. 320, 323 (S.D.N.Y. 1990).

HBCB operates the Hampton Beach Casino Ballroom ("the Ballroom") which offers both live performances and recorded music.  HBCB acquired the Ballroom in 1992 from Club Casino, Inc. Fred Shaake is a stockholder and president of HBCB.  He is primarily responsible for supervising other employees and scheduling performances.

On June 9, 1993, Lawrence Stevens, BMI's Assistant Vice President of General Licensing, notified HBCB through Shaake that it was to cease all use of BMI music until it secured authorization from BMI.  Shortly thereafter, BMI initiated discussions regarding a license agreement for the public performance of BMI's music at the Ballroom.  BMI again informed

2

HBCB of the need to obtain a license agreement in order to lawfully perform music from BMI's repertoire. A BMI representative met with Shaake and Emile Dumont, managers of the Ballroom, and requested information regarding the schedule of events, ticket sales, revenues, and seating capacity, in order to formulate a license agreement. BMI offered a license agreement to HBCB for a fee of $10,000 to $12,000 which HBCB rejected because it was much higher than the fee charged offered by American Society of Composers, Authors and Publishers ("ASCAP") for a license to perform its music.[2]

BMI subsequently contacted HBCB and enclosed a copy of its former agreement with Club Casino indicating the fees it had charged the Club from 1987 through 1994. BMI also stated that it was aware that HBCB publicly performed music from BMI's repertoire and should cease to further perform that music. On August 4, 5, and 27, 1993, an investigator hired by BMI entered the Ballroom and observed the performance of sixteen compositions from BMI's repertoire.[3]

---

[2]ASCAP operates similarly to BMI, licensing copyrighted works for public performances through blanket license agreements.

[3]Those compositions are: "Keep Your Hands to Yourself"; "Viva Las Vegas"; "Workin' Man Blues"; "Georgia on My Mind" a/k/a

In September 1993, BMI sent HBCB another license agreement proposing a $7,600 license fee. BMI based the proposed fee on the erroneous assumption that HBCB planned to hold forty (40) performances (rather than the thirty-one (31) actually proposed), and that the price charged for tickets would be $29.99 (rather than the average ticket price of $16.47). HBCB also rejected this proposed fee. However, the record does not reveal whether HBCB ever informed BMI that the proposed fee had been based on erroneous information.

No license agreement was ever consummated between BMI and HBCB authorizing HBCB to publicly perform music from BMI's repertoire at the Ballroom.

B. The Consent Decree

The United States District Court for the Southern District of New York issued a consent decree in 1966 which governs the conduct of BMI in its dealings with writers, publishers, and music users. Prior to its amendment in 1994, the Decree stated

---

"Georgia"; "Me and Bobby McGee"; "Help me Make it Through the Night"; "Loving Her was Easier (Than Anything I'll Ever do Again)"; "Always on My Mind"; "Mammas Don't Let Your Babies to be Cowboys"; "Rollin' In My Sweet Baby's Arms"; "Old Time Rock 'n Roll" a/k/a "Old Time Rock & Roll"; "Time Won't Let Me"; "Mustang Sally"; "In the Mid Night Hour" a/k/a "In the Midnight Hour"; "Dance to the Music"; and "Good Lovin'".

4

in pertinent part that:

> [BMI] shall include in all contracts which it tenders to writers, publishers and music users relating to the licensing of performance rights a clause requiring the parties to submit to arbitration in the City, County and State of New York under then prevailing rules of the American Arbitration Association, all disputes of any kind, nature or description in connection with the terms and conditions of such contracts or arising out of the performance thereof or based upon alleged breach thereof. VII(C).

With respect to the rates it may charge the Decree stated in pertinent part:

> Defendant shall not enter into, recognize as valid or perform any performing rights license agreement which shall result in discriminating in rates or terms between licensees similarly situated; provided, however, that differentials based upon applicable business factors which justify different rates or terms shall not be considered discrimination within the meaning of this section; and provided further that nothing contained in this section shall prevent changes in rates or terms from time to time by reason of changing conditions affecting the market for or marketability of performing rights. VIII(A).

> Defendant shall not assert or exercise any right or power to restrict from public performance by any licensee of defendant any copyrighted musical composition in order to exact additional consideration for the performance thereof, or for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition; provided, however, that nothing in this paragraph shall prevent defendant from restricting performances of a musical composition in order reasonably to protect the work against indiscriminate performances or the value of the public performance rights therein or to protect the dramatic performing rights therein, or, as may be

> reasonably necessary in connection with any claim or litigation involving the performance rights in any such composition.    X(B).

United States v. Broadcast Music, Inc., Civil No. 64-CV-3787 (S.D.N.Y. Dec. 29, 1966).[4]


## II. Discussion

A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling on a summary judgment motion, the court does not find facts, but rather construes the evidence in the light

---

[4]On November 18, 1994, the United States District Court for the Southern District of New York revised the Decree.  In relevant part the Revised Decree amended paragraph VII(C) quoted above by adding a final clause which states: "except that in all contracts tendered by defendant to music users, the clause requiring the parties to submit to arbitration will exclude disputes that are cognizable by the Court pursuant to Article XIV hereof." United States v. Broadcast Music, Inc., Civil No. 64-CV-3787 (S.D.N.Y. Nov. 18, 1994).

Article XIV of the Revised Decree establishes a rate court and procedure for the negotiation of fees between BMI and music users.  Id.

most favorable to the nonmovant.  <u>Murphy v. Franklin Pierce Law Center</u>, 882 F. Supp. 1176, 1180 (D.N.H. 1994), <u>aff'd</u>, 56 F.3d 59 (1st Cir. 1995) (per curiam).

Where the movant bears the burden of proof, the nonmovant "must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact" in order to avoid summary judgment.  <u>Id.</u>  If the issue is one for which the burden of proof at trial rests on the nonmovant, then that party may forestall summary judgment by pointing to supporting evidence in the record or producing additional evidence sufficient to preclude the granting of a directed verdict for the movant.  <u>Id.</u> at 1116-17.  With these standards in mind, I address the merits of the parties' motions.

B. BMI's Burden on its Copyright Infringement Claim

BMI claims that the defendants infringed several of its copyrights and that it is entitled to summary judgment on this claim because there are no genuine issues of material fact.  In support of its motion BMI provides affidavits, admissions, and copies of the registration certificates filed with the Copyright Office for each work that was publicly performed without BMI's authorization.  In order to prevail on a claim for copyright infringement, a copyright owner must prove: (1) originality and

7

authorship of the compositions; (2) compliance with the formalities of the Copyright Act; (3) that the plaintiffs are the proprietors of the copyrights of the compositions involved; (4) public performance of the compositions for profit; and (5) lack of proper authorization. Jobete Music Co. v. Massey, 788 F. Supp. 262, 265 (M.D.N.C. 1992) (citing Hulex Music v. Santy, 698 F. Supp. 1024, 1030 (D.N.H. 1988)); Merrill v. County Stores, Inc., 669 F. Supp. 1164, 1168 (D.N.H. 1987) (citing Sailor Music v. Mai Kai, Inc., 640 F. Supp. 629, 632 (D.N.H. 1986)). For the following reasons, I conclude that BMI has established and properly supported its claim for copyright infringement.

**1. Originality, authorship, compliance with Copyright Act, and proprietary rights**

The registration certificates of the copyrights establishes the first two elements of copyright infringement. 17 U.S.C.A. § 410(c) (West 1977);[5] accord Broadcast Music, Inc. v. Larkin, 672 F. Supp. 531, 533 (D. Me. 1987) (certificates constitute prima

---

[5]Section 410(c) states in pertinent part:
> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.

Id.

facie evidence that copyright is valid); Sailor Music, 640 F. Supp. at 632-33 (citing Blendingwell Music, Inc. v. Moor-Law, Inc., 612 F. Supp. 474, 480 (D. Del. 1985)). Further, defendants admitted that the copyrights at issue were properly registered and are original works. See Defendants' Responses to Request for Admissions 9a, 10a, 11a, and 12a (hereinafter "Responses").

With respect to the third element, where the plaintiff is also the author of their musical compositions, the certificates are prima facie evidence of proprietorship. Broadcast Music, Inc. v. The Ringe Lane Corp., Civil No. 93-460-JD, slip op. at 11 (D.N.H. March 27, 1995). Where, however, the plaintiffs are assignees of previously registered copyrights, the plaintiff must show evidence beyond the registration certificate to show proprietary rights in the compositions. Id. at 12 (citing Moor-Law, 484 F. Supp. at 363). In support of its contention that there is no genuine issue of material fact with respect to this element, plaintiffs rely on an affidavit from BMI's general counsel as well as the certificates themselves. As with the first two elements, defendants do not challenge this evidence and have admitted BMI's proprietary interest in the musical compositions. Therefore, there is no genuine issue of material fact with respect to the first three elements of plaintiffs'

9

claim.  <u>Broadcast Music, Inc. v. Pine Belt Inv. Developers, Inc.</u>, 657 F. Supp. 1016, 1020 (S.D. Miss. 1987) (certificates and accompanying affidavit, plus defendant's admissions sufficient to show first three elements of copyright infringement).

## 2. Public Performance for Profit

BMI must also show that the musical works were publicly performed for profit in order to establish copyright infringement.  "It is well settled that investigators' affidavits can constitute sufficient proof of live public performance." <u>Larkin</u>, 672 F. Supp. at 533 (citing <u>Milene Music Inc. v. Gotauco</u>, 551 F. Supp. 1288, 1294 (D.R.I. 1982)).  BMI provided an affidavit from Mark Cornaro, an investigator hired by BMI, which states that on August 4, 5, and 27, 1993, he entered the Ballroom and made a written report of all the songs performed on those nights.  Among the list of songs were the BMI works listed in their complaint.  Defendants provide no evidence to contradict Cornaro's report and have admitted that on the relevant dates in August 1993, the Ballroom was open to the public and live music was performed.  <u>See</u> Responses 2a-2f, 3-5.

In addition, BMI must show that the public performance was for profit which requires proof that the defendants "derived pecuniary benefit from the public performance of the copyrighted

works." <u>Larkin</u>, 672 F. Supp. at 534. BMI offers no direct support for this element, but the record demonstrates that HBCB sells tickets for its performances which is sufficient to demonstrate that the performances are for profit. <u>See</u> <u>Broadcast Music, Inc. v. Allis</u>, 667 F. Supp. 356, 358 (S.D. Miss. 1986); <u>see</u> <u>also</u> <u>Larkin</u>, 672 F. Supp. at 534 (although no evidence offered to show defendants derived pecuniary benefit from the public performance court may infer its true).

### 3. Lack of Proper Authorization

Finally, BMI must show that defendants lacked proper authorization to perform the copyrighted works. BMI denied any knowledge of a license agreement between it and HBCB, and defendants admitted that there was no license agreement between them and HBCB at the time the copyrighted works were performed. <u>See</u> Responses 14a, 14b, and 14c; Aff. of Lawrence Stevens.

### 4. Liability of Shaake

BMI's claim for copyright infringement alleges that Shaake also violated the copyright laws and is jointly and severally liable for the infringement with HBCB. "The test for finding a corporate officer jointly and severally liable with his corporation for copyright infringement is whether the officer 'has the right and ability to supervise the infringing activity

11

and also has a direct financial interest in such activities.'" Larkin, 672 F. Supp. at 534 (liability based upon belief that individual is in position to control conduct of primary infringer) (quoting Warner Brothers, Inc. v. Lobster Pot, Inc., 582 F. Supp. 478, 482 (N.D. Ohio 1984)). "Any significant control over the daily operation of the business is sufficient to warrant the imposition of vicarious liability." Id.

Defendants' Answer (document no. 6) states in pertinent part: "Defendants admit that Mr. Fred Shaake is a stockholder and officer of [HBCB]. Defendants admit that Mr. Shaake's primary responsibility is arranging for the retention of talent, musical or otherwise, for performances." In addition, the defendants admitted that on the relevant dates, Shaake had a direct financial interest in HBCB and that he had the right and ability to supervise employees of HBCB. See Responses 1g-1i, 1j-1l. Defendants have provided no other evidence to contradict these admissions. Therefore, BMI has established through uncontradicted evidence that Shaake is also liable for the infringing acts.

In summary, plaintiffs have established a prima facie case of copyright infringement through uncontradicted evidence. Therefore, I turn to whether defendants produced sufficient

12

evidence in support of their copyright misuse defense to withstand summary judgment.

C. Copyright Misuse Defense

Defendants do not attempt to challenge BMI's evidence of copyright infringement. Rather, they argue that BMI's motion should be denied because there are genuine issues of material fact as to whether BMI misused its copyright. Specifically, defendants contend that BMI, in violation of the Decree, misused its monopoly power over its repertoire by demanding an excessive price for performing BMI's compositions.[6] Defendants bear the burden of proving an affirmative defense and therefore in order to forestall the granting of summary judgment they must offer sufficient evidence in support of their affirmative defense to permit a reasonable trier of fact to rule in their favor. Assuming without deciding that this circuit would recognize the

---

[6]The infringing acts and negotiations at issue all occurred before the Revised Consent Decree was issued in November 1994. Therefore, at the time of these events, there was no rate court established to adjudicate rate disputes and the reasonableness of the rates charged by BMI. Instead, the Decree gave the defendants the option either to negotiate separate agreements with each copyright owner or to pay the fee BMI demanded and then submit their fee dispute to arbitration.

misuse defense,[7] I conclude that defendants have failed to offer sufficient evidence in support of their defense to withstand summary judgment.

Copyright misuse occurs when a copyright owner restrains competition in the sale of an item that is not within the scope of the privilege granted under the copyright. Lasercomb Am. Inc. v. Reynolds, 911 F.2d 970, 975 (4th Cir. 1990) (discussing Morton Salt Co. v. G.S. Suppiger, 314 U.S. 488 (1942)); cf. United Tel. Co. v. Johnson Publishing Co., 855 F.2d 604, 610 (8th Cir. 1988) (discussing patent misuse and its application in copyright context).[8] A defendant may prove copyright misuse by either proving (1) a violation of the antitrust laws; or (2) that BMI otherwise illegally extended its monopoly or violated the public

_____

[7]The First Circuit has not addressed the issue of copyright misuse. The Second, Fourth, Fifth, Seventh, Eighth, Ninth, Federal circuits, however, have recognized the defense of copyright misuse. See Ramsey Hanna, Misusing Antitrust: The Search for Functional Copyright Misuse, 46 Stan L. Rev. 401, 405 n.23 & 24 (1994) (collecting cases).

[8]Copyright misuse derives from the doctrine of patent misuse that is a well established defense to patent infringement claims. To show patent misuse, "'requires that the alleged infringer show that the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect.'" United Tel. Co., 855 F.2d at 610 (quoting Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1001 (Fed. Cir.) (internal quotations and citations omitted), cert. denied, 477 U.S. 905 (1986)).

14

policies underlying the copyright laws.  Lasercomb, 911 F.2d at 978 (attempted use of copyright to violate antitrust law would give rise to misuse defense, but is not required to state such a defense); National Cable Tel. Ass'n v. Broadcast Music, Inc., 772 F. Supp. 614, 652 (D.D.C. 1991); Coleman v. ESPN, Inc., 764 F. Supp. 290, 295 (S.D.N.Y 1991) (misuse defense prevents copyright owner from recovering for infringement where owner impermissibly extended monopoly in manner equivalent to unreasonable restraint on trade).  For example, misuse may be found based on blanket licensing practices if there are no alternative licensing arrangements available, Coleman, 764 F. Supp. at 295 n.11, or where the purchase of a license is "tied" to the purchase of another copyright, United Tel. Co., 855 F.2d at 611.  HBCB does not allege that BMI's licensing practices violated the antitrust laws, therefore, I focus on whether BMI's negotiations with HBCB illegally extended BMI's monopoly power in violation of the public policy underlying the copyright laws.

In essence, defendants argue that BMI illegally exploited its monopoly power by demanding that HBCB pay an excessive license fee.  They support this argument with evidence that: (1) BMI's proposed fee is substantially higher than the fee it charged the Ballroom's prior owner; (2) the proposed fee is

15

substantially higher than the fee HBCB pays to ASCAP; and (3) BMI based the proposed fee on erroneous information concerning the number of performances, ticket prices, and expected ticket sales. Even if this information is considered in the light most favorable to the defendants, however, it is insufficient to withstand plaintiff's summary judgment motion.[9]

First, evidence that BMI's proposed fee substantially exceeds the fee paid by the Ballroom's prior owner does not prove that the proposed fee is excessive unless both businesses are similarly situated. Since defendants have produced no evidence that would allow me to compare their business with the prior owner's business, a reasonable fact finder could not conclude that the proposed fee is excessive simply because it significantly exceeds the fee charged the prior owner. Similarly, even if ASCAP's fee is substantially lower than BMI's

---

[9]Defendants assert that this evidence also proves that BMI violated provisions of the Decree prohibiting (1) discrimination in the rates that BMI charges to similarly situated licensees; and (2) restrictions preventing the performance of copyrighted works in order to exact additional compensation from licensees. Even if a copyright misuse defense could be established by proving a violation of the Decree, defendants' evidence suffers from the same deficiencies discussed below. Accordingly, defendants cannot survive summary judgment on this basis even if copyright misuse could be proved by establishing that BMI violated the Decree.

16

proposed fee, a reasonable fact finder could not infer from this evidence that the higher fee represents the unlawful exploitation of market power without some evidence concerning the similarities and differences between the two licenses. Since defendants have failed to produce any such evidence to support their claim I must reject this argument. Finally, although defendants did offer evidence to show that the proposed fee was based on erroneous information concerning the number of performances, ticket prices, and the number of tickets HBCB expected to sell at each performance, they provided no evidence to suggest that they ever communicated this information to BMI during the course of negotiations over the proposed fee. Under these circumstances, defendants are in no position to argue that BMI was attempting to exploit its market power by charging for performances that would not include BMI's music.

In summary, defendants have offered insufficient evidence to support their copyright misuse defense. Accordingly, plaintiffs are entitled to summary judgment.

### III. Copyright Infringement Relief

BMI seeks permanent injunctive relief, statutory damages for each of the claims of infringement, costs, and reasonable attorney's fees. Although HBCB's failure to respond to this part

of BMI's motion for summary judgment does not entitle BMI to automatic judgment, summary judgment is appropriately granted in BMI's favor on these remaining issues if, based on the undisputed record presented by BMI, they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e). For the following, reasons I grant BMI's requested relief.

A. Permanent Injunction

BMI seeks a permanent injunction restraining HBCB from infringing its copyrights in the future. Under the Copyright Act,

> [a]ny court having jurisdiction of a civil action arising under this title may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

17 U.S.C.A. § 502(a) (West 1977). Courts generally grant permanent injunctions where liability is clear and there is a continuing threat to the copyright. Pedrosillo Music Corp. v. Radio Musical, Inc., 815 F. Supp. 511, 516 (D.P.R. 1993) (irreparable injury presumed where movant establishes infringement); Merrill, 669 F. Supp. at 1171 (injunction granted where substantial likelihood of further infringement exists). HBCB was informed by BMI at least four times that a license and permission were necessary prerequisites to the lawful performance

18

of music within BMI's repertoire.  Further, HBCB has not yet obtained a license from BMI or the owners of the copyrights directly.  Pedrosillo, 815 F. Supp. at 516 (citing Ackee Music, Inc. v. Williams, 650 F. Supp. 653, 656 (D. Kan. 1986)); Sailor Music, 640 F. Supp. at 634 (noting that even where defendant at time of suit has obtained license, injunctive relief may be appropriate).  Based on the foregoing, I conclude that BMI is entitled to a permanent injunction enjoining defendants' use of compositions in BMI's repertoire in violation of the Copyright Act because there is a substantial likelihood of further infringement.

B. Statutory Damages

BMI requests $3,000 for each of the sixteen infringements totalling $48,000, which is approximately three (3) times the license fees HBCB should have paid for music performed at the Ballroom in 1993 and 1994, because HBCB acted willfully.

Under the Copyright Act,

[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any   one work ... in a sum of not less that $500 or more than   $20,000 as the court considers just.

17 U.S.C.A. § 504(c)(1) (West 1977 & Supp. 1995).  The Act

19

further provides that the court may, at its discretion, exceed that maximum statutory damages upon a finding of willful violation and, conversely reduce the damages below the minimum upon finding an unknowing or innocent violation. Id. at § 504(c)(2).[10] The purpose of these provisions is to "deter and discourage wrongful conduct." Merrill, 669 F. Supp. at 1171.

In determining the amount of statutory damages, I should consider BMI's lost revenues, expenses saved and profits reaped by HBCB as a result of the infringement, the size of HBCB's operation, and whether HBCB's conduct was intentional or accidental. Merrill, 669 F. Supp. at 1171. Courts focus, however, on the element of intent and the award rises commensurate with the blameworthiness of the conduct. Milene Music, 551 F. Supp. at 1296.

HBCB avoided paying license fees to BMI for two years and admitted its awareness of the need to obtain permission before it could lawfully perform the musical compositions in BMI's

---

[10]I may award statutory damages without submitting the matter to the jury and, in the context of copyright infringement, such relief is routinely granted at the summary judgment stage. Broadcast Music, Inc. v. The Ringe Lane Corp., Civil No. 93-460-JD, slip op. at 25, 27 n.7 (D.N.H. March 27, 1995) (citing PGP Music v. Davric Maine Corp., 623 F. Supp. 472, 472-73 (D. Me. 1985)).

repertoire. Although I find that this constitutes a knowing violation, the amount requested by BMI is disproportionate to the amount awarded in prior cases where the conduct was clearly more blameworthy than that at issue here. E.g., The Ringe Lane Corp., slip op. at 29 (award within statutory range of $800 per infringing act where defendants had license and ignored renewal and cancellation notices); Pedrosillo, 815 F. Supp. at 517 (award of $10,000 per infringing act where defendant avoided license fees for fourteen years and would have paid $114,000 in license fees over that time); Sailor Music, 640 F. Supp. at 635-36 (award of $550 per infringing act where defendant had license for other establishment, avoided license fee for two years, and defendants totally disregarded ASCAP's licensing efforts); Milene Music, 551 F. Supp. at 1295 (awarded $625 per infringing act where defendants had license, but failed to pay fee and continued to publicly perform works from repertoire).

Therefore, I award BMI statutory damages in the amount of $1,000 per violation, for a total award of $16,000. In addition, I order defendants to pay post-judgment interest in accordance with the federal interest rate set forth in 28 U.S.C.A. § 1961 (West 1994 & Supp. 1995).

21

D. Costs and Reasonable Attorney's Fees

BMI seeks reimbursement for its full costs as well as its reasonable attorney's fees. BMI's attorney's affidavit states that the reasonable attorney's fees and costs incurred in prosecuting this action total $2,262.50. The Copyright Act provides that the court "in its discretion may allow the recovery of full costs by or against any party other than the United States ... [and] a reasonable attorney's fees to the prevailing party as part of the costs." 17 U.S.C.A. § 505 (West 1977). I conclude that attorney's fees and costs are warranted in this case because BMI "would not have had to bring this action but for [HBCB]'s deliberate refusal to obtain proper licensing." Merrill, 669 F. Supp. at 1172.

"In determining the amount of fees that should be awarded the court will consider, among other things, counsel's time and labor, the complexity of the case, the amount recovered, and the reasonableness of the time spent by counsel." Sailor Music, 640 F. Supp. at 636. HBCB has not objected to the reasonableness of the fees and costs, and considering the factors limned above, I conclude that the attorney's fees sought are reasonable. Therefore, I grant BMI's request for costs and attorney's fees.

22

## IV. Conclusion

For the foregoing reasons, I grant BMI's motion for summary judgment and the relief requested (document nos. 11 and 18).

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

August 30, 1995

cc:  Teresa C. Tucker, Esq.
     James E. Higgins, Esq.